# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Morton Denlow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 5999 | **DATE** | 8/20/2002 |
| **CASE TITLE** | Veronica Goodson vs. Jo Anne B. Barnhart | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____ . Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and order. The Commissioner's motion for summary judgment [14-1] is denied, Goodson's motion for summary judgment [13-1] is granted and the Commissioner's decision finding Claimant not disabled is remanded for further proceedings consistent with this opinion.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | AUG 2 2 2002 | |
| | Notified counsel by telephone. | | date docketed | | 19 |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | 8/20/2002 | | |
| | | | date mailed notice | | |
| DK | courtroom deputy's initials | | DK6 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

AUG 2 2 2002

| | | |
|---|---|---|
| VERONICA GOODSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 01 C 5999 |
| v. | ) | |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | Magistrate Judge Morton Denlow |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Veronica Goodson ("Claimant" or "Goodson") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), Jo Anne B. Barnhart, denying her application for Supplemental Security Income ("SSI") under the Social Security Act, Title XVI, 42 U.S.C. §§ 416(i), 423(d), 1383. Goodson claims the Commissioner's decision to deny her benefits should be reversed and remanded because the Commissioner did not consider her psychotic disorder. Both parties now move for summary judgment. For the reasons stated herein, this Court denies the Commissioner's motion for summary judgment, grants Claimant's motion for summary judgment, and remands the case to the Commissioner for further proceedings consistent with this decision.

## I. RELEVANT FACTS

### A. PROCEDURAL HISTORY

Goodson has filed three applications for SSI benefits. (R. 20). She filed her first

19

application on January 21, 1993; this application was denied by an Administrative Law Judge ("ALJ"). (R. 20). Claimant subsequently requested a review by the Appeals Council which was denied. (R. 20). Goodson filed her second application on August 20, 1996. (R. 20). This application was denied initially and Goodson did not appeal. (R. 20). Goodson filed the application which is the subject of this action on August 15, 1997. (R. 20). Her application was denied initially and upon reconsideration. (R. 20). She requested a hearing and testified at the hearing where she was represented by counsel. (R. 50). Vocational Expert, Richard J. Hammersma ("VE"), also testified. (R. 50). ALJ Charles J. Frisch rendered an unfavorable decision. (R. 17-27). Goodson's request for review with the Appeals Council was denied. (R. 9).

## B.  GOODSON'S HEARING TESTIMONY

On May 14, 1999, Goodson testified before ALJ Frisch at a Social Security Administration ("SSA") Hearing. Goodson was born on October 13, 1963. (R. 197). She completed the tenth grade and began the eleventh grade, but did not finish. (R. 58). Claimant took courses towards her GED; however, she never received her GED. (R. 71). Goodson has not tried to work since she was involved in a training program at McDonald's in Junior High School. (R. 61). She has no previous work experience. (R. 61). She currently is not attending school. (R. 61). When asked if there was any physical reason why she could not work, Goodson stated her feet hurt from time to time. (R. 59).

Goodson's treating psychiatrist and examining psychologist have diagnosed her with

2

psychotic disorder, NOS and a personality disorder, NOS. (R. 338-39, 323). With regards to her mental condition, she testified Dr. Bradley Gordon prescribes medication for her mental impairment and when she stopped seeing him for about a year she was seeing other counselors. (R. 64). Goodson sees this other counselor, Kitty Goldberg, twice a week and attends group therapy every other week. (R. 67). Goodson also attends Alcoholics Anonymous ("AA") meetings. (R. 67).

Goodson takes medication because she sees and hears things that are not there and has attacks. (R. 64-65). She feels a little better when she takes her medication. (R. 61). However, she still sees and hears things despite being medicated. (R. 68). This bothers her and makes her feel scared; she sometimes sleeps with the light on at night. (R. 68). During her attacks, she experiences cravings, mental headaches, shaking, and blurred vision. (R. 70). Goodson has been free from drugs and alcohol for a year and a half, yet she testified she only sometimes knows where she is, where she lives, and what is going on around her. (R. 61, 64).

Claimant receives General Assistance and food stamps to purchase food and medications. (R. 60). Goodson rents a room from her mother and sister. (R. 55-56). She makes her own simple meals, does her own laundry, and sometimes cleans her room. (R. 56). She has four children, all of whom were adopted by her father. (R. 56). Her father died in July 1998 and his wife cares for the children. (R. 56, 58). Goodson has telephone contact with the children. (R. 57).

3

Goodson stated her test scores in reading, writing, and arithmetic are very low. (R. 58). She can read basic mail and her sister helps her with the rest. (R. 58). She can write a simple grocery list or message. (R. 58). She took the train to the hearing. (R. 59). When she is not attending therapy appointments, she sleeps, watches television, occasionally walks to the grocery store or drugstore, and attends church. (R. 59-60, 63). She may socialize with her sister around the house. (R. 62). Before her father died, she socialized with other people and visited her father. (R. 69). Since his death, her attacks and feeling like she is missing something have increased. (R. 70).

## C.    MEDICAL EVIDENCE

The medical evidence in this case consists of records from Goodson's visits with her treating psychiatrist, Dr. Bradley Gordon; examining psychologist, Dr. Mary Gardner; state agency mental health professionals, psychiatrists Dr. Rachel Yudkowsky and Dr. Diane Washington, and psychologists Dr. Robert Casas and Dr. Carl Hermsmeyer. No records were submitted from her counselor, Kitty Goldberg.

### 1.    Dr. Bradley Gordon

Dr. Gordon is Claimant's treating psychiatrist. He first examined Claimant on February 11, 1998, when Claimant reported she wanted to "stop using [drugs] and remain clean and sober." (R. 309). At that time, Dr. Gordon completed a psychiatric evaluation of Goodson and opined she was circumstantial and tangential in her thinking, she was oriented times four, her mood was "settled," her affect was appropriate to content, she had no

4

homicidal or suicidal ideation, and her intellect, reasoning, attention and concentration, insight, judgment and memory were all intact. (R. 310). Dr. Gordon assigned a Global Assessment of Functioning (GAF) score of 60 indicative of moderate to mild symptoms. (R. 311). *See Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 32 (4th ed. 1994). Dr. Gordon also saw Claimant on March 11 and December 1, 1998. (R. 306).

Dr. Gordon saw Claimant in 1999 on January 22, February 3, 10, and 24, March 3, and 17, April 14, 21, and 28. (R. 303-08). On February 3, 1999, Dr. Gordon prescribed Serentil, an anti-psychotic medication for Goodson. (R. 307). On March 3, 1999, Dr. Gordon diagnosed Goodson with a psychotic disorder, NOS, and opined her GAF on that date was 45 with a GAF of 30 in the past. (R. 308). Dr. Gordon prepared a report on May 12, 1999 in which he indicated Claimant was under his "indirect care" for several months. (R. 338). He detailed Goodson's former drug use and diagnosed her with psychotic disorder, NOS and a personality disorder, NOS. (R. 338-39). At this time, Dr. Gordon also completed a "Medical Opinion Re: Ability to do Work-Related Activities" form. (R. 340-41). This form indicated Claimant was seriously limited but not precluded from performing the mental demands of unskilled work, and had poor or no useful ability in other areas. (R. 340-41). Dr. Gordon opined Claimant had poor or no useful ability to understand, remember or carry out detailed instructions, interact appropriately with the general public, or maintain socially appropriate behavior. (R. 341). He also rated her "fair" (ability to function is seriously limited, but not precluded) in all categories associated with her mental abilities and aptitudes

5

needed to do unskilled work. (R. 340).

## 2. Dr. Mary Gardner

Dr. Gardner, a psychologist, examined and tested Claimant at the request of her attorney in May, 1999 and diagnosed Claimant as suffering from psychopathology that included guardedness and hypervigilance. (R. 319-24). The exam indicated Goodson was alert and oriented in all spheres, but was unable to pronounce simple words and could not perform basic mathematical operations. (R. 321-22). Goodson completed the MCMI-III, producing a valid score, strongly indicating the presence of significant psychopathology. (R. 322). Goodson is also acutely paranoid and may become periodically belligerent. (R. 322). The test also showed clinical evaluations on two of the three severe personality pathology scales (Schizotypal and Paranoid), suggesting a dysfunctional personality disorder is likely. (R. 322). Dr. Gardner diagnosed Goodson with Psychotic Disorder, NOS and Paranoid Personality Disorder. (R. 323). She also opined Goodson would not be able to sustain meaningful employment given the nature of her severe psychological problems and Goodson would not be capable of managing her own funds if she were awarded benefits. (R. 324).

As part of her evaluation, Dr. Gardner completed a Psychiatric Review Technique Form indicating Goodson met Listing 12.02 and equaled Listing 12.08 based upon her diagnosis of categories 12.03 (schizophrenic, paranoid and other psychotic disorders) and 12.08 (personality disorders). (R. 325). In her Mental Residual Functional Capacity assessment, Dr. Gardner noted marked limitations in Goodson's ability to remember

locations and work-like procedures, the ability to understand and remember, or carry out detailed instructions, maintain attention and concentration, the ability to sustain an ordinary routine, and the ability to complete a normal work day without interruptions from psychologically based symptoms. (R. 334). Dr. Gardner noted moderate limitations in the ability to understand, remember, and carry out very short and simple instructions, the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and the ability to work in coordination with or proximity to others without being distracted by them. (R. 334). Lastly, Dr. Gardner found Goodson was not significantly limited in her ability to make simple work-related decisions. (R. 334).

### 3. Dr. Rachel Yudkowsky

In June 1993, Dr. Yudkowsky, a psychiatrist, examined Claimant for the state agency and completed a psychiatric evaluation. (R. 163-66). Dr. Yudkowsky diagnosed Claimant with alcohol and drug abuse in remission. (R. 165). She noted Claimant did "not seem to have any other complicating psychiatric disorder" and found Goodson's ability to do work-related activities involving understanding, memory, sustained concentration, and persistence not impaired at present with some exception. (R. 165).

Dr. Yudkowsky examined Claimant again in November 1997 and diagnosed 1) developmental delay, probably borderline mental retardation, and 2) alcohol abuse, possibly in remission. (R. 281). Dr. Yudkowsky opined Goodson probably could function in a sheltered or low pressure and non-competitive working situation. (R. 282).

### 4.    Dr. Diane Washington

Dr. Washington, a psychiatrist, examined Claimant in January 1994 and diagnosed her with chronic alcohol abuse and dependence, polysubstance dependence in remission for one year and a half, and borderline intellectual functioning. (R. 167-69). At this time, Claimant denied auditory or visual hallucinations. (R. 168).

### 5.    Dr. Robert Casas

Dr. Casas, a psychologist, performed a psychological evaluation of Claimant in January 1998 at the request of the agency. (R. 285-87). Dr. Casas administered the Wechsler Adult Intelligence Scale - Revised test ("IQ test") on Goodson. (R. 285). Goodson's verbal score was 91, her performance score was 88, and her full scale score was 88. (R. 285). The test indicated Goodson functions, at least, within the low average range of general intellectual ability for her age group. (R. 286). Dr. Casas opined this should be considered a minimal estimate of her general level of ability based on her attitude during testing. (R. 286-87). Dr. Casas also detected an odor of alcohol present on Claimant at this time. (R. 285, 287). Dr. Casas concluded Goodson likely functions in the average range of general intellectual ability or higher. (R. 287).

### 6.    Dr. Carl Hermsmeyer

In February 1994, Dr. Hermsmeyer reviewed the medical evidence and found Claimant's ability to understand, remember, and carry out detailed instructions moderately limited, but was not otherwise significantly limited. (R. 170-71). He concluded Goodson

8

had the mental capacity to perform simple tasks. (R. 172). Dr. Hermsmeyer reviewed the record again in January 1998 and reached the same conclusion, that Goodson had the mental capacity to perform simple tasks. (R. 299). He also opined Claimant met category 12.05, mental retardation and autism. (R. 170, 288).

### 7. Kitty Goldberg

According to the ALJ, the record is void of documents from Kitty Goldberg, Claimant's counselor who she sees twice a week. (R. 23).

## D. VOCATIONAL EXPERT'S TESTIMONY

VE Hammersma testified after reading the exhibits and listening to the Claimant's testimony. (R. 70-76). The VE was asked a number of hypotheticals. The first involved a claimant with no prior work experience who is 35 years old, completed the tenth grade and started the eleventh grade, has a verbal IQ of 91, a performance IQ of 88, and a full scale IQ of 88, with some type of personality disorder involving suspicion, a substance abuse disorder in remission, borderline mental capacity, attended a regular school classroom but experienced some learning disability, and took courses toward a GED. (R. 71).

Assuming this claimant was mentally limited, with no physical limitations, to simple four-step work limited to brief and superficial contact with coworkers and supervisors, and no public contact, the VE testified in the Chicago metropolitan area, at the medium level, 18,000 kitchen helper jobs and 12,000 assembly positions exist. (R. 72). At the light or sedentary level, 10,000 office cleaner jobs, 8,000 assembly positions, and 7,000 hand packing

jobs exist. (R. 73). If this claimant had a psychotic break, then she could not work competitively. (R. 74). Also, taking everything on Dr. Gordon's "Medical Opinion Re: Ability to do Work-Related Activities" form of Claimant, combined with the RFC, no jobs would be available to the Claimant. (R. 74-75).

## E.    THE ALJ'S DECISION

On July 12, 1999, ALJ Frisch determined Goodson was not entitled to SSI. (R. 17-36). In reaching this conclusion, the ALJ engaged in the five-step analysis required by SSA regulations. 20 C.F.R. §§ 416.920, 404.1520.

At step one, the ALJ found Claimant had no substantial gainful work activity. (R. 21). The ALJ then turned to step two and determined the Claimant was not subject to a severe physical impairment but was subject to a severe mental impairment. (R. 21). Therefore, the ALJ completed a Psychiatric Review Technique Form ("PRTF"). (R. 21, 28-36). On this form, the ALJ checked that Claimant required an RFC assessment based upon category 12.08 Personality Disorder, but failed to check the box for category 12.03, Schizophrenic, Paranoid and other Psychotic Disorders. (R. 28). He also checked the box "present" for 12.09 Substance Addiction Disorder but qualified it by writing "in possible remission." (R. 34). In his Rating of Impairment Severity, the ALJ based his findings for degree of limitation only on listings 12.08 and 12.09 and neglected to include listing category 12.03. (R. 35). Lastly, the ALJ did not assess the "Criteria of the Listings" for 12.03. (R. 36).

In his decision, the ALJ evaluated Claimant's history of substance abuse and

determined her disorder was in probable remission. (R. 21). He also acknowledged the record indicated a diagnosis of psychotic disorder and a personality disorder and described her as having features of paranoia, periodically belligerent, suspicion, and/or mistrustfulness. (R. 21). She currently takes the following medications: Serentil, Desipramine, and Benzotropine MES. (R. 21). He found the record did not support a diagnosis of borderline intellectual functioning and noted her I.Q. scores. (R. 21-22).

At step three, the ALJ concluded Goodson's condition did not meet or equal the level of severity required for any listed impairment, specifically Section 12.08 (personality disorder). (R. 22). The ALJ rejected Dr. Gardner's opinion that Claimant met Section 12.02 or equaled Section 12.08 because her only contact with Claimant was one examination and no other doctor concluded Claimant's impairment met the listing level. (R. 22). The ALJ evaluated the Claimant's RFC as "simple four step work with no more than brief and superficial contact with co-workers and supervisors and no contact with the public, and no work with strict production quotas." (R. 23).

Because the Claimant's complaints are subjective, the ALJ assessed Claimant's credibility under Social Security Ruling ("SSR") 96-7p and 20 C.F.R. § 416.929. (R. 22). He found her testimony not fully credible and supported his finding by discussing Goodson's doctor's reports and findings. (R. 23-25). The ALJ opined Dr. Gordon's psychiatric evaluation of February 11, 1998 was inconsistent with his May 12, 1999 letter and Medical Opinion Re: Ability to do Work-Related Activities form. (R. 23). Claimant's treatment

11

record of February 11, 1998 indicated Claimant's intellect, reasoning, attention and concentration, insight, judgment, and memory were all intact. (R. 23). The ALJ also cited to progress notes opining Claimant's memory was good, her situation was changing for the better, her mood was busy and focused with appropriate affect, she was stable. (R. 23). The ALJ noted the record was void of supporting documentation from Claimant's therapist, Kitty Goldberg who, according to Claimant, has been seeing her twice a week. (R. 23). The ALJ opined Claimant's daily activities are only slightly limited by her mental impairments, she experiences moderate difficulties maintaining social functioning although her problems are moderate, and she often experiences deficiencies of concentration, persistence or pace. (R. 24).

Because Claimant has no past relevant work history, she met step four. (R. 25). Therefore, after the burden shifted to the Commissioner at step five, the ALJ looked to the testimony of the VE to determine whether a significant number of jobs remain in the economy which Goodson can perform. (R. 25). Relying on the VE's testimony, the ALJ concluded Claimant retained the RFC to perform a significant number of jobs existing in the national economy, specifically, kitchen helper (18,000 jobs), assembly person (12,000 jobs at medium level and 8,000 jobs at light level), office cleaner (10,000 jobs), and hand packager (7,000 jobs). (R. 25-26).

Following the ALJ's decision, Goodson requested review by the Appeals Council. On June 14, 2001, the Appeals Council denied Goodson's request for review, thus the ALJ's

decision became the final decision of the Commissioner. (R. 9-10).

Currently before the Court are Goodson's and the Commissioner's cross-motions for summary judgment. Goodson contends the ALJ's decision to deny her benefits was contrary to law and was not supported by substantial evidence. Oral argument was held August 14, 2002. For the reasons stated herein, Goodson's motion is granted and the Commissioner's motion is denied.

## II. LEGAL STANDARDS

Judicial review of a Commissioner's final decision is governed by 42 U.S.C. § 405(g) which provides the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In other words, the ALJ's findings must be supported by more than a mere scintilla of the evidence. *Id.*

A reviewing court may not decide facts anew, re-weigh the evidence, or substitute its own judgment for that of the Commissioner. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). Rather, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching its decision and whether there is substantial evidence in the record to support the findings. 42 U.S.C. § 405(g); *Scivally v. Sullivan*, 966 F.2d 1070, 1075 (7th Cir. 1992). The SSA gives a court the power to enter a judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding

13

the cause for a hearing." 42 U.S.C. § 405(g).

In order to be entitled to DIB under Title II of the SSA the claimant must establish a "disability" as defined by the Social Security Act. The same is true to qualify for SSI under Title XVI of the SSA. *Zurawski v, Halter*, 245 F.3d 881, 885 (7th Cir. 1997). To establish a "disability" the claimant must show he is suffering from a medically determinable physical or mental impairment which can be expected to result in death or, which has lasted or can be expected to last for at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). Additionally, an individual shall be considered disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work." 42 U.S.C. §§ 423 (d)(2)(A), 1382c(a)(3)(B).

The Social Security Regulations provide a five-step process to determine whether a claimant has established a "disability." 20 C.F.R. § 404.1520. The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. *Id.* The ALJ must inquire: 1) whether the claimant is still working; 2) whether the claimant has a severe impairment; 3) whether the claimant's impairment meets or equals a listed impairment; 4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and 5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. ANALYSIS

The issues presented are 1) whether the ALJ substituted his judgment for the medical judgment of Goodson's doctors, and 2) whether the ALJ's decision was supported by substantial evidence.

## A.  THE ALJ IMPROPERLY SUBSTITUTED HIS JUDGMENT FOR THE MEDICAL JUDGMENT OF CLAIMANT'S DOCTORS

Goodson contends the ALJ substituted his judgment for the medical judgment of her doctors, specifically Drs. Gordon and Gardner. The Seventh Circuit does not permit ALJs to substitute their judgment for that of medical professionals. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996); *Wilder v. Chater*, 64 F.3d 335, 337 (7th Cir. 1995). Specifically, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings. *Rohan*, 98 F.3d at 970.

Drs. Gordon and Gardner diagnosed Claimant as suffering from psychotic disorder, NOS and personality disorder, NOS. Dr. Gordon first diagnosed this disorder on February 3, 1999 and prescribed Serentil, an anti-psychotic medication. R. 307. Although the ALJ acknowledged in his opinion that the record contained evidence of a diagnosis of both a psychotic disorder and a personality disorder, the ALJ chose to focus only on Goodson's personality disorder and did not include her psychotic disorder in his findings. R. 26. Furthermore, in the Psychiatric Review Technique Form, evidence of a psychotic disorder is excluded from the ALJ's consideration of Claimant's mental impairments. R. 28-36. In giving little or no weight to her psychotic disorder, the ALJ did not cite to any medical report

15

or opinion that contradicts Drs. Gordon's and Gardner's opinions. In effect, the ALJ substituted his judgment for that of the doctors. However, an ALJ must not substitute his own judgment for a doctor's opinion without relying on other medical evidence or authority in the record. *Clifford*, 227 F.3d at 870.

This Court acknowledges the ALJ's possible skepticism over both doctors presenting their opinions within days of the hearing; however, both doctors are professionals and without contrary evidence, the ALJ should not substitute his judgment for theirs. In particular, Dr. Gordon treated Claimant "indirectly" for over one year and saw her approximately ten times in the five months before the May 1999 hearing. It was the responsibility of the ALJ to contact the doctors if he found any inconsistencies, have a medical expert testify at the hearing, or send Claimant to another psychiatrist to satisfy himself of Claimant's condition. 20 C.F.R. § 416.912(e)(f). Furthermore, in discussing another type of mental illness, depression, the Seventh Circuit has stated:

> Severe depression is not the blues. It is a mental illness; and health professionals, in particular psychiatrists, not lawyers or judges, are the experts on it. [Wilder] is entitled to a decision based on the record rather than on a hunch. The salient fact of record is the testimony of the psychiatrist, a disinterested as well as expert witness. Everything else is rank conjecture.

*Wilder*, 64 F.3d at 337, 338. Neither the ALJ nor this Court should engage in conjecture regarding whether Claimant suffers from a mental illness. This must be left to health professionals.

The ALJ indulged his lay view of psychotic disorder for that of Drs. Gordon and

16

Gardner. The record is void of contradictory reports of other health professionals. The ALJ found Dr. Hermsmeyer's opinion that Claimant's impairments met Section 12.05 (mentally retarded) inconsistent with Dr. Casas' report showing Claimant functions at least within the low average range of general intellectual ability. Although Dr. Hermsmeyer's assessment of Claimant is inconsistent with her test results, this assessment does add credibility to the diagnosis of Drs. Gordon and Gardner that Goodson does suffer from a severe mental impairment. Moreover, Goodson's IQ test performed by Dr. Casas was the only contradictory medical evidence the ALJ relied upon in reaching his decision. In his decision, the ALJ is critical of Dr. Gardner's opinion because she only examined Claimant once. R. 22. However, the ALJ is not equally critical of Dr. Casas, who also only examined Claimant one time. R. 24. Rather, the ALJ looks to Dr. Casas' assessment in determining Claimant's credibility noting Dr. Casas found Claimant was uncooperative and evasive. R. 24. Moreover, while the ALJ recognized the IQ test given by Dr. Casas, the ALJ failed to recognize the Million Clinical Multiaxial Inventory-III test ("MCMI-III") given by Dr. Gardner which produced a valid score and strongly indicated the presence of significant psychopathology.[1] R. 322. This contradiction in standards between Dr. Gardner and Dr.

---

[1] "Ms. Goodson was able to complete the MCMI-III with reading assistance from the examiner. She produced a valid score and her profile strongly indicates the presence of significant psychopathology. Ms. Goodson has achieved an extremely high elevation on multiple severe pathology scales. Her highest score was on the scale that measures delusional disorder. This scale was designed to pick out paranoid individuals with a psychotic level of symptomatic presentation. Ms. Goodson is acutely paranoid and may become periodically belligerent, voicing irrational but interconnected delusions of a jealous, persecutory or grandiose nature. An undercurrent of suspiciousness, vigilance and alertness to possible betrayal are typical features."

Casas lends further support that the ALJ improperly substituted his judgment for the medical judgment of Claimant's doctors. The ALJ, properly, did not rely on the state agency health professionals Goodson saw years prior to the hearing.[2]

## B. THE ALJ'S DECISION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

Goodson claims the ALJ did not consider all of her impairments, specifically evidence she suffers from a psychotic disorder, in assessing her RFC and whether or not she is disabled. Goodson also contends the ALJ's credibility determination failed to comport with the requirements of Social Security Ruling ("SSR") 96-7p. Lastly, Goodson asserts the ALJ erred at step five in concluding she could perform work in the national economy.

In making a decision, the ALJ must articulate his analysis of the evidence. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The ALJ is not required to address every piece of evidence or testimony, but must provide some glimpse into his reasoning. *Id.* Where an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to his conclusion. *Id.*

### 1. Psychotic Disorder

Whether or not Claimant suffers from a psychotic disorder requiring unscheduled "psychotic breaks" is case determinative. The VE testified if Claimant experienced

---

R. 322.

[2] The Commissioner relies upon these state agency health professionals in its brief, however, because the ALJ did not rely upon the opinions and because it is not this Court's position to re-weigh evidence, the Court does not give weight to those opinions.

"psychotic breaks" she could not work competitively. On the other hand, when presented with a hypothetical that included a claimant who did not suffer "psychotic breaks," the VE testified Claimant could work competitively and named many jobs in the national economy Claimant could perform. Therefore, whether or not Goodson is disabled hinges on whether or not Goodson suffers from "psychotic breaks."

In this case, the ALJ dismissed Goodson's claims and her doctors' diagnosis of a psychotic disorder without explaining his decision. This Court was unable to follow why the ALJ accepted Goodson's diagnosis of a personality disorder while rejecting her diagnosis of a psychotic disorder. The regulations provide that the Commissioner will consider the "combined effect of all of your impairments" in determining whether a claimant is disabled. 20 C.F.R. § 416.923.

Claimant's treating psychiatrist and examining psychologist diagnosed Claimant with a psychotic disorder involving delusional thinking or hallucinations. A treating physician's opinion is generally given more weight because of his familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record. *Id.* Here, the treating psychiatrist diagnosed Claimant with psychotic disorder and prescribed her with an anti-psychotic medication. Furthermore, as discussed *supra*, the ALJ's decision was not based on inconsistent findings of other psychiatrists. Rather,

examining psychologist, Dr. Gardner, agreed with Dr. Gordon's diagnosis of a psychotic disorder. Lastly, the VE testified at the hearing that a person suffering from "psychotic breaks" could not perform competitive work.

It was the ALJ's responsibility to build a logical bridge from this evidence of Claimant's pyschotic disorder to the ALJ's finding of not disabled. *Dixon*, 270 F.3d at 1176. Because the ALJ failed to do so, his decision was not supported by substantial evidence. Claimant is entitled to have this impairment considered in the disability evaluation process. *Prak v. Chater*, 892 F.Supp. 1081, 1087 (N.D.Ill. 1995) (remanding for a new hearing because the ALJ failed to assess the disabling severity of post traumatic stress disorder).

A claimant's RFC is what she can still do in a work setting despite her limitations. 20 C.F.R. § 416.945(a). In this case, the ALJ found Goodson had "the residual functional capacity for simple four step work with no more than brief and superficial contact with co-workers and supervisors and no contact with the public, and no work with strict production quotas." R. 26. The VE testified if Claimant experienced "psychotic breaks," she would be precluded from competitive employment. In assessing Claimant's RFC, it is again the responsibility of the ALJ to consider all of Claimant's impairments. 20 C.F.R. § 416.945(a). Once the ALJ reevaluates Claimant's medical condition with regards to her psychotic disorder, the ALJ must determine whether this RFC is appropriate for Claimant. If the ALJ finds Claimant does suffer from a psychotic disorder, then the ALJ must include this diagnosis in his RFC assessment. *Id.*

### 2. Credibility

Once the ALJ completes his assessment of Claimant's mental impairments either by contacting Drs. Gordon and Gardner to clear up any inconsistency, by calling a medical expert to testify, and/or by sending Goodson for an independent medical assessment, then the ALJ should perform a new credibility determination of Claimant. At that point, the medical evidence may confirm Claimant is suffering from a psychotic disorder. Furthermore, the ALJ may find her evasive behavior not unusual for someone suffering from such a disorder.[3]

### 3. Work in the National Economy

According to the VE, if Claimant suffers from a psychotic disorder, no jobs exist in the national economy that Goodson could perform. Therefore, once the record is clear on whether or not Goodson suffers from a psychotic disorder, the ALJ can then engage in a step five analysis.

## IV. CONCLUSION

Claimant's mental health doctors diagnose Claimant as suffering from a psychotic disorder, NOS and personality disorder, NOS. Under these circumstances, the VE testified

---

[3] "The MCMI-III also indicates that while her initial presentation is evasive, it is clear that she is highly guarded and attempts to ward off what she perceives as intrusive questions from others. She is likely to be quarrelsome, fractious and abrasive, and has few acquaintances. She is unwarrantedly skeptical and mistrustful of the motives of others including relatives, friends and associates. She tends to read hidden messages into benign matters and to magnify tangential or mild difficulties into proof of duplicity and treachery. She displays a cold and humorless demeanor and attempts to appear unemotional and objective but is often edgy, envious and jealous of others. Thus, it is clear that Ms. Goodson suffers from severe psychopathology." R. 323.

no jobs are available to Claimant. The ALJ substituted his judgment for the medical judgment of Goodson's doctors and did not address the issue of her psychotic condition in his RFC or explain why he has substituted his opinion for their medical judgment. For the reasons set forth in this opinion, the **Commissioner's motion for summary judgment is denied, Goodson's motion for summary judgment is granted, and the Commissioner's decision finding Claimant not disabled is remanded for further proceedings consistent with this opinion.**

**SO ORDERED THIS 20th DAY OF AUGUST, 2002.**

**MORTON DENLOW**
**United States Magistrate Judge**

**Copies mailed to:**

Barry A. Schultz
Law Offices of Barry A. Schultz, P.C.
1609 Sherman Avenue, Suite 207
Evanston, IL 60201
(847) 864-0224

Henry Rose
Loyola Law School
One East Pearson St.
Chicago, IL 60611-2055
(312) 915-7840
**Attorneys for Plaintiff**

Samuel D. Brooks
Assistant United States Attorney
219 South Dearborn Street, 5th Floor
Chicago, IL 60604
(312) 353-5342

Curt P. Marceille
Assistant Regional Counsel
200 West Adams Street, 30th Floor
Chicago, IL 60606
(312) 353-9217
**Attorneys for Defendant**